Case No.: 24-40472

———————————————————————————————

In the United States Court of Appeals for the Fifth Circuit
_____

**PARIS THORPE, AS NEXT FRIEND A.B.,
PLAINTIFF – APPELLANT**

**DARREN BOYKIN,
INTERVENOR PLAINTIFF- APPELLANT**

v.

**JERRIKA WEAVER; BRENT HOBBS; WILLIAM SCOTT
DEFENDANTS - APPELLEES**

_____

Direct Appeal from the United States District Court for the Eastern District of Texas, Texarkana Division, No. 5:21-cv-106-RWS-JBB, the Honorable Robert W. Schroeder III presiding.

**Appellant's Opening Brief**

_____

James P. Roberts
**Palmer Perlstein**
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Office: 214-987-4100
Facsimile: 214-922-9900
Email: james@palmerperlstein.com

**Counsel for Appellant Paris
Thorpe as next friend of A.B.**

CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. **Paris Thorpe as Next Friend of A.B., and on behalf of the Estate of Darren Boykin** (Plaintiff/Appellant);

2. **Darren Boykin, Sr.** (Plaintiff/Appellant);

3. **James Roberts**, Palmer Perlstein, 15455 Dallas Parkway, Suite 540, Addison, Texas 75001 (Attorney for Appellant at trial);

4. **Scott Palmer**, Palmer Perlstein 15455 Dallas Parkway, Suite 540, Addison, Texas 75001 (Attorney for Appellant at trial);

5. **Breanta Boss**, Palmer Perlstein 15455 Dallas Parkway, Suite 540, Addison, Texas 75001 (Attorney for Appellant at trial);

6. **Jerrika Weaver**, (Defendant/Appellee);

7. **Brent Hobbs**, (Defendant/Appellee);

8. **William Scott**, (Defendant/Appellee);

9. **Daryl K. Washington**, Washington Law Firm, PC., 325 N. St. Paul St., Suite 3950, Dallas, Texas 75201 (Attorney for Intervenor/Appellant Darren Boykin Sr., at trial and on appeal);

10. **Darren K. Coleman**, Boon, Calk, Echols, Coleman & Goolsby P.L.L.C., 1800 W. Loop 281, suite 303, Longview, Texas (Attorney for Defendants Brent Hobbs and William Scott at trial and on appeal);

11. **Robert W. Weber**, Smith Weber, L.L.P., 5505 Plaza Drive, Texarkana, Texas 75503 (Attorney for Defendant Jerrika Weaver/Appellee on appeal);

12. **The Honorable Robert W. Schroeder III** (United States District Court Judge for trial);

13. **The Honorable J. Boone Baxter** (United States Magistrate Judge).

*/s/ James P. Roberts*
James P. Roberts

**Attorney of Record for Appellant Paris Thorpe, as Next Friend of A.B., and on Behalf of the Estate of Darren Boykin.**

STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument. As this Court has explained, claims involving qualified immunity are fact-intensive and depend on the facts and circumstances of each particular case. Here, the facts – including the video evidence – require a thorough analysis. Oral argument will help develop the factual details in the record before this Court.

Table of Contents

*CERTIFICATE OF INTERESTED PERSONS*..............................................................................2

*STATEMENT REGARDING ORAL ARGUMENT* ..................................................................4

*TABLE OF AUTHORITIES*.................................................................................................6

*STATEMENT OF JURISDICTION*........................................................................................9

*STATEMENT OF ISSUES PRESENTED FOR REVIEW*...........................................................10

*STATEMENT OF THE CASE* ............................................................................................11

*SUMMARY OF THE ARGUMENT* ....................................................................................24

*ARGUMENT* ..................................................................................................................27

    Appellant's First Issue .............................................................................27

        A.   Standard of Review................................................................27

        B.   Law for Summary Judgment..................................................27

        C.   Constitutional Violation for Deliberate Indifference to Medical Needs .28

    Appellant's Second Issue.........................................................................40

*CONCLUSION AND PRAYER*...........................................................................................55

*CERTIFICATE OF SERVICE* ...........................................................................................56

*CERTIFICATE OF COMPLIANCE*.....................................................................................56

TABLE OF AUTHORITIES

**CASES**

*Allen v. Hays,*
    65 F.4th 736, 747-48 (5th Cir. 2023) ............................................................ passim

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)............................28

*Austin v. City of Pasadena, Tex.,*
    74 F.4th 312, 326 (5th Cir. 2023) ......................................................................41

*Batiste v. Theriot,*
    458 F. App'x. 351 (5th Cir. 2012)................................................................. 52, 53

*Bias v. Woods,*
    288 F. App'x 158, 162 (5th Cir. 2008) ......................................................... 24, 30

*Davis v. Scherer,*
    468 U.S. 183, 192 n.9, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).........................41

*Domino v. Texas Dep't of Crim. Just.,*
    239 F.3d 752, 756 (5th Cir. 2001) ...................................................... 10, 27, 39

*Dyer v. Houston,*
    964 F.3d 374, 384-85 (5th Cir. 2020) ................................................................46

*Easter v. Powell,*
    467 F.3d 459 (5th Cir. 2006) ....................................................... 26, 42, 43, 54

*Elder v. Holloway,*
    510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994)............................41

*Farmer v. Brennan,*
    511 U.S. 825, 842 n. 8, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)............... 24, 30

*Fielder v. Bosshard*,
  590 F.2d 105, 108 (5th Cir. 1979) ............................................................... passim

*Ford v. Anderson Cnty., Texas*,
  102 F.4th 292, 314 (5th Cir. 2024) ...................................................... 25, 30, 33, 54

*Ford v. Anderson Cnty., Texas*,
  90 F.4th 736, 754 (5th Cir. 2024) .........................................................................40

*Hope v. Pelzer*, 536 U.S.
  730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).................................... 40, 41

*Hope v. Pelzer*,
  536 U.S. 730, 740-41 (2002) ....................................................................... passim

*Joseph ex rel. Est. of Joseph v. Bartlett*,
  981 F.3d 319, 338 (5th Cir. 2020) ................................................................ 40, 41

*Kelson v. Clark*,
  1 F.4th 411, 417 (5th Cir. 2021) .................................................................. passim

*Nerren v. Livingston Police Department*,
  86 F.3d 469 (5th Cir. 1996) ......................................................................... passim

*Poole v. City of Shreveport*,
  691 F.3d 624, 627 (5th Cir. 2012) ................................................................ 27, 28

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133, 150 (2000).....................................................................................28

*Rodrigue v. Grayson*,
  557 F. App'x 341, 347 (5th Cir. 2014) ........................................................ passim

*Shumpert v. City of Tupelo*,
  905 F.3d 310, 319 (5th Cir. 2018), *as revised* (Sept. 25, 2018) .................. 40, 41

*Terrebonne Par. Sch. Bd. v. Mobil Oil Corp.*,
  310 F.3d 870, 877 (5th Cir. 2002) .........................................................................28

*Tolan v. Cotton*,
  572 U.S. 650, 655-56, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014) .....................40

*Upshor County, Texas*,
  245 F.3d 447 (5th Cir. 2001) ...............................................................................46

*Williams v. City of Yazoo, Mississippi*,
  41 F.4th 416,423 (5th Cir. 2022) ................................................................. 26, 42

**STATUTES**

18 U.S.C. § 3742 ....................................................................................................9

28 U.S.C. § 1291 ....................................................................................................9

**RULES**

FED. R. APP. P. 4(b)(2) ...........................................................................................9

FED. R. CIV. P. 56(a).............................................................................................28

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

PARIS THORPE AS NEXT FRIEND OF A.B. ET AL.,
PLAINTIFF - APPELLANT
V.
BRENT HOBBS ET AL.
DEFENDANT - APPELLEE

STATEMENT OF JURISDICTION

1. The jurisdiction of the United States District Court for the Northern District of Texas was founded upon 18 U.S.C. § 3231.

2. The jurisdiction of the United States Court of Appeals for the Fifth Circuit is founded upon 28 U.S.C. § 1291 and 18 U.S.C. § 3742, and is based upon the following particulars:

   I.   Date of Judgment: **June 18, 2024**; ROA.4128.

   II.  Filing of notice of appeal: **July 9, 2024**. This notice of appeal was timely. FED. R. APP. P. 4(b)(2). ROA.4180-4181.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

FIRST ISSUE: The district court erred in adopting the magistrate's report and granting summary judgment because Appellant raised genuine disputes of material facts as to whether Appellees were deliberately indifferent to Darren Boykin Jr.'s health and safety in violation of his Fourteenth Amendment right not to have his serious medical needs met with deliberate indifference, when Appellees were aware that Boykin was complaining of an inability to breathe and begging for help, yet Appellees failed to take reasonable measures to abate his harm – instead ignoring his complaints. *Domino v. Texas Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) (To show deliberate indifference, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."). This was error.

SECOND ISSUE: The district court erred in granting summary judgment because the law was clearly established that Appellees violated Boykin's Fourteenth Amendment rights when Appellees were aware that Boykin was complaining of an inability to breathe and begging for help, yet Appellees failed to take reasonable measures to abate his harm – instead ignoring his complaints. This was error.

STATEMENT OF THE CASE

On August 29, 2019, at approximately 2:03 p.m., Texarkana College Dean of Workforce, Community, and Business Education, Brandon Washington ("Washington"), advised TCPD officer Gisela Altamirano ("Altamirano") that he had observed a young black male with a blue backpack on campus and that the physical description matched the description of a suspect involved in two prior thefts occurring on the campus earlier in August 2019. ROA 1232, 1282-83, 1286-87. Officer Vickey "Vic" Lynn Thornburg ("Thornburg") made initial contact with Boykin on the second floor and asked his name. ROA 1283. As Altamirano approached them, Boykin ran away and Altamirano pursued him outside. ROA 1287. Altamirano caught up with Boykin and tackled him approximately one-half mile from where the chase began. ROA 1288. The temperature on the afternoon of August 29, 2019 was approximately 90 degrees Fahrenheit with a relative humidity of 52%, resulting in a Heat Index Temperature of 96 degrees Fahrenheit. ROA 1435. Boykin was secured in handcuffs. ROA 1288.

Appellee Weaver arrived on the scene to find Boykin lying on the ground in handcuffs with Texarkana College Police Department Chief Steven Gass ("Chief Gass") kneeling next to him holding his arm. ROA 3193 2:35. Appellee Weaver saw and heard the following, which was captured on her body worn camera. ROA 3193.

A concerned citizen was inquiring about Boykin stating she thought he had suffered a heart attack, but Chief Gas simply responded, "no he has committed several felonies is what it is." ROA 3193 at 2:35-2:41. Altamirano told Boykin to sit up, and he responded, "I can't sit up." ROA 3193 at 2:49-2:51. Chief Gass then physically lifted Boykin into a seated position on the ground. ROA 3193 at 3:00-3:05. Boykin was unable to stand up. ROA 3193 at 3:47-3:53. Weaver stated "It's either you're standing up or you're dragging. All right. Cool. Let's drag him." ROA 3193 at 3:54-3:58. Chief Gass, Altamirano, and Weaver then carried Boykin to Weaver's patrol car. ROA 3193 at 4:00-4:25. Weaver and Gass placed Boykin against the back seat of her car and told him to get into her car. ROA 3193 at 4:50-4:53. Boykin responded that he needed help getting in and Weaver then raised her voice and tone, stating, "get in or I'm going to pull you in!" ROA 3193 at 4:54-4:59. Boykin inched his way into the backseat. ROA 3193 at 4:59.

Appellant Hobbs arrived and heard Boykin "trying to get someone's attention from the back seat of the [patrol] car." ROA 3269-3270. Hobbs went over and spoke with Boykin. ROA 3270, 3619 at 6:19-6:58. Hobbs testified that, "Mr. Boykin stated to me that he could not breathe." ROA 3270, 3619 at 6:19-6:58. Boykin told Hobbs twice that he could not breathe and asked for the air conditioner to be turned on. ROA 3270, 3619 at 6:19-6:58. Hobbs turned on the air conditioner but refused to do anything in response to Boykin's complaints of being unable to breathe. ROA 3270.

Hobbs admitted during his deposition that Boykin could have been explaining "difficulty in breathing" and not a complete and total inability to breathe. ROA 3273. Hobbs testified that he was aware that difficulty breathing could be a serious issue because it could be potentially life threatening and one of the ways that someone could voice that they are having difficulty breathing is to state so. ROA 3276. Hobbs testified that there was nothing preventing him from contacting EMT to check on Mr. Boykin. ROA 3286. However, Hobbs ignored Boykin's pleas for help and never took any action to respond to Boykin's complaints that he was unable to breathe. ROA 3291.

Hobbs told Weaver that Boykin was complaining that he couldn't breathe and Weaver – without checking on Boykin or doing any follow up – responded, "He'll be fine." ROA 3193 at 6:29-6:34. Boykin told Hobbs again that he could not breathe, and Hobbs callously responded, "you could breathe long enough to get over here and run." ROA 3272, 3619 at 6:19-6:58; 3193 at 6:39-6:40. Boykin again told Hobbs that he could not breathe. ROA 3272, 3619 at 6:19-6:58. Weaver told Boykin, "You can't call I can't breathe after you ran forever and then you have felonies," and Boykin responded, "I can't." ROA 3193 at 6:43-6:51.

Weaver testified that she understood the ability to speak did not preclude the inability to breathe. ROA 3174. Shockingly, Weaver testified that on many occasions people she has arrested for felonies claim they cannot breathe; however,

13

she has never called for medical attention for someone who claims they cannot breathe. ROA 3110-11. Weaver heard Boykin plead for help by saying, "please help me," and Weaver responded, "I'm going to help you get your way down to the jail." ROA 3113-14, 3193 at 7:56-8:03.

Scott arrived on the scene and was the only Sergeant from the Texarkana, Texas Police Department on the scene. ROA 2785. Hobbs told Scott that Boykin was complaining that he couldn't breathe. ROA 2788, 3193 at 9:12-9:15. During this time, Boykin, yelled out "Help!" a couple of times. ROA 3194 at 9:00 to 9:14. Scott testified that Hobbs relayed pertinent information about Boykin to Scott when Scott arrived on scene and part of that pertinent information was that Boykin was complaining he couldn't breathe. ROA 2789-91, 3196 at 1:01-1:10. Scott admitted during his deposition that he asked no follow up questions when Hobbs informed him that Boykin claimed he could not breathe. ROA 2797. Scott admitted during his deposition that he never spoke with Mr. Boykin at the scene of the arrest despite being informed that Boykin could not breathe. ROA 2797-98. Scott admitted he did not call for medical assistance and did not instruct Hobbs nor Weaver to call for medical assistance, despite being informed that Mr. Boykin was hollering he could not breathe. ROA 2792. Scott admitted that he along with Weaver and Hobbs had the ability to call for an ambulance at the scene of Boykin's arrest, but they did not

14

do so. ROA 2793-95. Scott admitted that he along with Weaver and Hobbs had the ability to drive Boykin directly to the hospital but they did not do so. ROA 2798-99.

As Weaver got into the front seat of her patrol unit, Boykin was softly stating in the back, "please, help me." ROA 3193 at 9:22-9:25. Weaver asked, "Can you feel the air," to which Boykin responded, "No." ROA 3193 at 9:28-9:31 (also stating "I can't breathe"). At that moment, Scott spoke to Weaver through the open front passenger window. ROA 3193 at 9:32; 3196 at 1:20; 3117-18 (stating she heard Boykin say he could not breathe when she was cut off by Scott). Weaver pulled away from the scene without anyone providing Boykin with medical care or attention. ROA 3194 at 9:50.

A couple of minutes into the drive, Boykin's head fell forward and hit the divider in Weaver's police car, Weaver heard the impact, and looked back to see Boykin's head against the plexiglass. ROA 3194 at 11:43-11:48. Boykin then said "Ma'am" – and Weaver responded, "Yeah?" ROA 3194 at 12:17-12:19. Boykin then told her, "I'm about to pass out." ROA 3194 at 12:18-12:19. Weaver responded, "You're gonna do what?" ROA 3194 at 12:20-12:21. Boykin again stated, "I'm about to pass out." ROA 3194 at 12:21-12:22. Weaver responded, "You're about to?" and Boykin said, "Yes." ROA 3194 at 12:23-12:24. Then, much more desperately, Boykin pleaded, "I'm about to pass out!" ROA 3194 at 12:26-12:27. Weaver responded, "You'll be ok, just lean against the glass." ROA 3194 at 12:28-

12:30. This interaction occurred at least ten minutes after Boykin stopped running. ROA at 3127. Boykin then called out "Help!" loud enough for Weaver to hear – as it was louder than he spoke during the previous interaction. ROA 3194 at 12:39. Weaver ignored his cry for help. ROA 3194 at 12:40-12:50. Boykin again pleaded "help." ROA 3194 at 12:52. Again, Weaver ignored him. ROA 3194 at 12:53-13:00. Boykin's head again fell forward into the plexiglass making a loud sound. ROA 3194 at 12:55. Weaver immediately looks into her rearview mirror at Boykin – clearly in response to hearing the sound. ROA 3194 at 12:56. Weaver stopped at a light and used this opportunity to turn around and look at Boykin. ROA 3194 at 13:12. Boykin stated, "listen ma'am" and Weaver responded, "huh?" ROA 3194 at 13:16-13:18. Boykin pleaded, "I can't even talk." ROA 3194 at 13:19. Weaver responded, "okay." ROA 3194 at 13:21. Boykin never responded to Weaver again after this moment. ROA 3194 at 13:21-19:10.

Boykin lost consciousness. ROA 3194 at 13:55. Weaver asked Boykin, "where you staying now?" ROA 3194 at 15:06. Boykin did not respond. ROA 3194 at 15:06-15:10. Weaver then asked, "where you livin now?" ROA 3194 at 15:11. At the same time, she turned and looked at Boykin. ROA 3194 at 15:11-15:12. Boykin did not respond. ROA 3194 at 15:11-15:13. Weaver then asked, "what's your address?" ROA 3194 at 15:13. Boykin did not respond. ROA 3194 at 15:14-15:15. Weaver looked up into her rearview mirror at Boykin and could see he was slumped

to the side, with his eyes closed, and gasping for air. ROA 3194 at 15:14-15:15. Weaver stated out loud, "alright." ROA 3194 at 15:17. Weaver then stated, "You know you're still going to jail either way right." ROA 3194 at 15:20-15:22. <u>Weaver was literally driving past the Wadley Hospital at this time</u>. ROA 3137-3138, 3194 at 15:20. However, Weaver did not take Boykin to the hospital. ROA 15:20-19:10.

Weaver looked up into her rearview mirror at Boykin and could see he was slumped to the side, with his eyes closed, and gasping for air. ROA 3194 at 15:23-15:24. Then, again, Weaver looked up into her rearview mirror at Boykin and could see he was slumped to the side, with his eyes closed, and gasping for air. ROA 3194 at 15:29-15:30. Weaver then turned around and looked at Boykin and could see he was slumped to the side, with his eyes closed, and gasping for air. ROA 3194 at 15:31-15:32. Weaver then said, "okay" apparently in response to seeing Boykin slumped to the side, with his eyes closed, and gasping for air. ROA 3194 at 15:33. Weaver then again looked up into her rearview mirror at Boykin and could see he was slumped to the side, with his eyes closed, and gasping for air. ROA 3194 at 15:39. Weaver then again turned around and looked at Boykin and could see he was slumped to the side, with his eyes closed, and gasping for air. ROA 3194 at 15:40-15:41. Weaver then <u>laughed to herself</u> after looking at Mr. Boykin and seeing he was slumped to the side, with his eyes closed, and gasping for air. ROA 3194 at 15:42. During her deposition, Weaver testified she didn't laugh but instead it was a "soft

17

chuckle." ROA 3145. Weaver then asked, "are you comfortable?" with no response from Boykin. ROA 3194 at 15:53. Weaver then started <u>humming</u>, showing a complete and total disregard for Boykin's health and safety. ROA 3194 at 16:02-16:03; 3145. Weaver then again looked up into her rearview mirror at Boykin and could see he was slumped to the side, with his eyes closed, and gasping for air. ROA 3194 at 16:13.

Weaver then asked, "Are you getting air back there?" with no response from Boykin. ROA 3194 at 16:15-16:17. Weaver again looked back at Boykin and could see he was slumped to the side, with his eyes closed, and gasping for air. ROA 3194 at 16:15-15:16. Weaver then again turned around and looked at Boykin and could see he was slumped to the side, with his eyes closed, and gasping for air. ROA 3194 at 16:18-16:19. Weaver then again looked up into her rearview mirror at Boykin and could see he was slumped to the side, with his eyes closed, and gasping for air. ROA 3194 at 16:22. Weaver then again turned around and looked at Boykin and could see he was slumped to the side, with his eyes closed, and gasping for air. ROA 3194 at 16:27-16:36. Weaver asked Boykin while she was staring at him "Hey Darren - are you getting air?" with no response from Boykin. ROA 3194 at 16:26-16:28. Weaver then again turned around and looked at Boykin and could see he was slumped to the side, with his eyes closed, and gasping for air. ROA 3194 at 16:46-16:48. Weaver looked back at Darren and said, "you know somebody that passes out isn't able to

stop themselves from falling forward right? Fun fact." ROA 3194 at 16:50-16:58. However, Darren had in fact passed out. Weaver then again turned around and looked at Boykin and could see he was slumped to the side, with his eyes closed, and gasping for air. ROA 3194 at 17:02. Weaver then again turned around and looked at Boykin and could see he was slumped to the side, with his eyes closed, and gasping for air. ROA 3194 at 17:20.

Inexplicably – or likely, on the advice of counsel – Weaver repeatedly testified during her deposition that despite turning around and looking at Boykin multiple times during the transport and looking into her rearview mirror multiple times at Boykin during the transport, she never saw his face and was clueless that he was in medical distress (despite acknowledging he repeatedly told her he couldn't breathe, was going to pass out, and then he stopped responding to her). ROA 3090-3091.

Weaver arrived at the Bi-State jail garage and parked her patrol vehicle. ROA 3194 at 19:04. It was only after arriving at the jail and Boykin was unable to exit the patrol car that Weaver sought medical care for Boykin. ROA 3156. While at the jail, Weaver discussed Boykin with Scott, acknowledging that she heard Boykin's cries for help, stating, "he kept saying he was going to pass out, he was going to pass out. Kept acting like he was going to pass out." ROA 3157. Weaver claims she believed Boykin was faking an injury due to having felony charges. ROA 3159-3160.

19

Expert witness Kevin Madison provided a report in which he concluded Appellees violated their duties by not obtaining medical care for Boykin. ROA 2929. Madison concluded Appellees failed to but should have called for emergency medical care at the scene of the arrest. ROA 2929-30. Madison stated police protocols required Appellees to call EMS under these circumstances. ROA 2930-32. Madison concluded that the failure to call for medical care violated "well-known police standards of conduct, well-known duties, and well-known protocols that require police officers to immediately summon medical assistance, such as EMS, when a suspect or arrestee becomes unconscious for any reason." ROA 2932.

Due to Appellees' deliberate indifference to Boykin's obvious medical needs, Boykin fell unconscious, became unresponsive, and later died at the Wadley Hospital – the same hospital Weaver drove past with Boykin in medical distress in the backseat of her patrol car. ROA 3137-3138, 3194 at 15:20. LifeNet transported Boykin to Wadley Regional Medical Center ("WRMC"). ROA 1724. Scott spoke with an attending nurse who advised Scott that Boykin's condition was critical but that he had a pulse and that his breathing was assisted. ROA 2851. Justice of the Peace Nancy Talley pronounced Boykin deceased at approximately 6:51 p.m. and signed an order for autopsy and release of medical records. ROA 1512.

WRMC records list the cause of death as sudden cardiac arrest; acute hypoxemic respiratory failure; hypoxic encephalopathy; acute renal failure;

hyperkalemia; and shock liver. ROA 1392-1395. An autopsy was performed at the Southwestern Institute of Forensic Sciences in Dallas. The medical examiner, Dr. Emily Ogden, found sickle cell trait in multiple organs. Dr. Ogden concluded that Boykin died as a result of complication of sickle cell trait. The Autopsy Report revealed Boykin had sickled red blood cells in his lungs, liver, kidney, heart, and spleen. ROA 1403. According to the autopsy's conclusion, Boykin died "as a result of complications of sickle cell trait," and the "physical exertion of running ˜ 1/3 mile, in Texas, in August, precipitated a sickle cell crises that ultimately led to the decedent's death." ROA 1404.

Dr. Francis O'Connor testified that, "with Mr. Boykin's apprehension, that there was a possibility, if not a probability, that with early treatment, he may have survived." ROA 3034. Dr. O'Connor explained, "I can't put a probability number on it. But I can reflect my experience, having studied this over 30 years, that people who are treated early can survive." ROA 3035. Dr. O'Connor elaborated, "I can tell you in my experience in dealing with this event, that the earlier you are treated, the greater the opportunity for survival. There are cases of ECAST where people are seen right away and they may die. But there are other cases that are seen right away and they survive. ROA 3037. Dr. O'Connor stated in his report, "In my professional opinion, early recognition of an ECAST event in Mr. Boykin's case, with early medical intervention to include oxygen, and intravenous hydration, may have

resulted in survival. While it is not expected that a non-medical professional would recognize an ECAST event, Mr. Boykin displayed clear signs of distress that in my opinion warranted evaluation from a medical professional." ROA 2975-76. Dr. O'Connor testified that difficulty breathing or the inability to breathe is a serious medical condition "Because if you can't breathe, you can't get oxygen to your brain or your heart, you're going to die." ROA 3046. Similarly, expert witness Kevin Madison wrote in his report that "There were sufficient red flags waiving that should have alerted Weaver and would have alerted a reasonably objective police officer on-scene that Boykin, who had run full-bore over half a mile in 90+ degree heat, who was handcuffed with his hands behind his back making it harder to expand and contract his chest and lungs, and who was complaining of an inability to breathe normally, needed immediate medical attention from EMS." ROA 2865. In Mr. Boykin's case, this evaluation could have resulted in earlier medical assessment and intervention, including oxygen, hydration, and transport to an emergency facility, that may have saved Mr. Boykin's life." ROA 2975-76. Mr. Madison wrote in his report that "EMS First Responders would have placed a non-re-breathable oxygen mask on Mr. Boykin and provided high-flow 100% bottled oxygen at a rate of 12-15 liters/minute. This procedure would have immediately provided much needed oxygen to Mr. Boykin. EMS would have checked all of Mr. Boykin's vital signs, including his temperature to ascertain if he was suffering a heat stroke, his pulse, his

blood pressure, and his oxygen saturation levels (SpO2)." ROA 2900. Dr. O'Connor testified that in his medical opinion, if Mr. Boykin would have been taken and diverted to the hospital instead of taken to the jail, he would have had an opportunity to receive medical care that could have reversed the course of what he was experiencing and allow him to survive. ROA 3048.

SUMMARY OF THE ARGUMENT

Despite the complexities of qualified immunity, this is a fairly simple case. The video evidence – including body camera footage and footage from inside of Appellee Jerrika Weaver's patrol car – clearly show (1) Appellant Darren Boykin Jr. complained of an inability to breathe and then lost consciousness and (2) Appellees Weaver, Brent Hobbs, and William Scott acknowledged Boykin's complaints that he couldn't breathe and ignored those complaints resulting in his loss of consciousness and death. Each of the Appellees claim that they did not subjectively believe Boykin was in serious medical distress. It is impossible to get inside the head of the Appellees, however, an "official's knowledge of a substantial risk of harm may be inferred by the obviousness of a substantial risk." *Bias v. Woods*, 288 F. App'x 158, 162 (5th Cir. 2008) (citing *Farmer v. Brennan*, 511 U.S. 825, 842 n. 8, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). As this Court recently explained in reference to a pretrial detainee being refused medical care in 2018 (a year prior to the death of Boykin in this case),

> Plaintiffs have not presented evidence of the Jailer Defendants directly admitting that they were subjectively aware of Newsome's cries or her dark-colored vomit. However, summary judgment evidence indicates that Newsome cried out for several hours in an area that Strong and Jones patrolled throughout the evening. Summary judgment evidence further indicates that the Jailer Defendants entered Newsome's cell in several instances. Accordingly, at this summary judgment stage, we find that Plaintiffs have presented a genuine dispute of material fact regarding whether Jailer-Defendants Strong and Jones heard

Newsome's cries and saw the dark-colored vomit. If a jury concludes that Strong and Jones heard these repeated cries for help and did nothing to assist Newsome, they could reasonably find that this conduct constituted deliberate indifference because they "refused to treat [her], ignored [her] complaints," and evinced "a wanton disregard for [her] serious medical needs." *Easter*, 467 F.3d at 465 (quoting *Domino*, 239 F.3d at 756).

*Ford v. Anderson Cnty., Texas*, 102 F.4th 292, 314 (5th Cir. 2024).

In 1979, this Court decided *Fielder v. Bosshard*, a case where a request by a prisoner's mother to the jailer that he receive medical attention for delirium tremens was followed by a request from the prisoner himself. *Fielder v. Bosshard*, 590 F.2d 105, 108 (5th Cir. 1979). These requests were ignored, the jailers stating that they thought the prisoner was "faking." *Id*. This evidence was sufficient to support the jury's verdict for the plaintiff. *Id*. In *Fielder*, this Court explained,

> The jury was carefully and correctly charged that mere negligence was insufficient to sustain a finding for the plaintiffs. The jury obviously believed that the appellants had crossed the line between misfeasance and conscious cruelty. <u>In a case such as this, where the attitudes and states of mind of the defendants weigh so heavily, we are quite reluctant to read between the lines of the record. We commit our trust to the jurors who saw and heard the witnesses.</u>

(emphasis added) *Fielder*, 590 F.2d at 108–09.

Here, like in *Ford* and *Fielder*, the video evidence creates genuine issues of material fact for a <u>jury to decide</u> whether each of the Appellees was on notice of Boykin's serious medical needs when he repeatedly told them he could not breathe

25

and whether Appellant Weaver saw him non-responsive and unconscious in the backseat of her patrol car. ROA 3193-96.

Additionally, the law was clearly established – putting Appellees on fair notice – that they violated Boykin's constitutional rights by ignoring Boykin's complaints and refusing to provide him medical care when he was pleading for help due to an inability to breathe and then when he lost consciousness in the backseat of Weaver's patrol car. *Easter v. Powell*, 467 F.3d 459 (5th Cir. 2006); *Nerren v. Livingston Police Department*, 86 F.3d 469 (5th Cir. 1996); *Williams v. City of Yazoo, Mississippi*, 41 F.4th 416,423 (5th Cir. 2022); *Allen v. Hays,* 65 F.4th 736, 747-48 (5th Cir. 2023); *Fielder v. Bosshard*, 590 F.2d 105, 108 (5th Cir. 1979); *Rodrigue v. Grayson*, 557 F. App'x 341, 347 (5th Cir. 2014); *Hope v. Pelzer*, 536 U.S. 730, 740-41 (2002).

Accordingly, the district court erred when it adopted the magistrate's report and found no constitutional violation occurred and that the law was not clearly established. ROA 4110-4127, 3991-4061. For these reasons, Appellant requests this Court reverse the district court's order and remand this case for trial.

26

<u>ARGUMENT</u>

**<u>Appellant's First Issue</u>**

The district court erred in adopting the magistrate's report and granting summary judgment because Appellant raised genuine disputes of material facts as to whether Appellees were deliberately indifferent to Darren Boykin Jr.'s health and safety in violation of his Fourteenth Amendment right not to have his serious medical needs met with deliberate indifference, when Appellees were aware that Boykin was complaining of an inability to breathe and begging for help, yet Appellees failed to take reasonable measures to abate his harm – instead ignoring his complaints. *Domino v. Texas Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) (To show deliberate indifference, the plaintiff must show that the officials "refused to treat him, <u>ignored his complaints</u>, intentionally treated him incorrectly, or <u>engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs</u>."). This was error.

A. Standard of Review

This Court reviews summary judgment *de novo*, applying the same standard as the district court. *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

B. Law for Summary Judgment

A grant of summary judgment is proper if and only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law. FED. R. CIV. P. 56(a). A dispute is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Poole*, 691 F.3d at 627. A fact is material if its resolution could affect the outcome of the action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In deciding whether there are genuine disputes of material fact precluding summary judgment, a court must review "all of the evidence introduced," but "all of the factual inferences from the evidence are viewed in a light most favorable to the party opposing the motion." *Terrebonne Par. Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002). A Court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* (quoting *Anderson*, 477 U.S. at 255).

C. Constitutional Violation for Deliberate Indifference to Medical Needs

As this Court explained in *Kelson v. Clark*, a case regarding the denial of medical care for a person detained and being seen by paramedics in 2015,

> "[P]retrial detainees have a constitutional right, under the Due Process Clause of the Fourteenth Amendment, not to have their serious medical needs met with deliberate indifference." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 457 (5th Cir. 2001) (citing, *inter alia*, *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and *Hare*, 74 F.3d at 636). "To succeed on a deliberate-indifference claim, plaintiffs must show that (1) the official was 'aware of facts from which the

28

inference could be drawn that a substantial risk of serious harm exists,' and (2) the official actually drew that inference." *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020) (quoting *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 755 (5th Cir. 2001)).

"Deliberate indifference is an extremely high standard to meet." *Id.* (quoting *Domino*, 239 F.3d at 756). An official is not liable unless he "knows of and disregards an excessive risk" to a plaintiff's safety. *Garza v. City of Donna*, 922 F.3d 626, 635 (5th Cir.) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)), *cert. denied*, —— U.S. ——, 140 S. Ct. 651, 205 L.Ed.2d 386 (2019). However, "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson*, 245 F.3d at 459 (citing *Hare*, 74 F.3d at 649–50). Rather, "the plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.' " *Domino*, 239 F.3d at 756 (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)); *accord Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006).

*Kelson v. Clark*, 1 F.4th 411, 417 (5th Cir. 2021).

Despite the complexities of qualified immunity, this is a fairly simple case. The video evidence – including body camera footage and footage from inside of Appellee Jerrika Weaver's patrol car – clearly show (1) Appellant Darren Boykin Jr. complaining of an inability to breathe and then losing consciousness and (2) Appellees Weaver, Brent Hobbs, and William Scott acknowledge Boykin's complaints that he couldn't breathe and ignore those complaints resulting in his loss of consciousness and death. ROA 3193-3196. Each of the Appellees claim that they

29

did not subjectively believe Boykin was in serious medical distress. ROA at 1293; 1719; 1724. It is impossible to get inside the head of the Appellees, however, an "official's knowledge of a substantial risk of harm may be inferred by the obviousness of a substantial risk." *Bias v. Woods*, 288 F. App'x 158, 162 (5th Cir. 2008) (citing *Farmer v. Brennan*, 511 U.S. 825, 842 n. 8, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). As this Court recently explained in reference to a pretrial detainee being refused medical care in 2018 (a year prior to the death of Boykin in this case),

> Plaintiffs have not presented evidence of the Jailer Defendants directly admitting that they were subjectively aware of Newsome's cries or her dark-colored vomit. However, summary judgment evidence indicates that Newsome cried out for several hours in an area that Strong and Jones patrolled throughout the evening. Summary judgment evidence further indicates that the Jailer Defendants entered Newsome's cell in several instances. Accordingly, at this summary judgment stage, we find that Plaintiffs have presented a genuine dispute of material fact regarding whether Jailer-Defendants Strong and Jones heard Newsome's cries and saw the dark-colored vomit. If a jury concludes that Strong and Jones heard these repeated cries for help and did nothing to assist Newsome, they could reasonably find that this conduct constituted deliberate indifference because they "refused to treat [her], ignored [her] complaints," and evinced "a wanton disregard for [her] serious medical needs." *Easter*, 467 F.3d at 465 (quoting *Domino*, 239 F.3d at 756).

*Ford v. Anderson Cnty., Texas*, 102 F.4th 292, 314 (5th Cir. 2024).

Here, the video evidence creates genuine issues of material fact for a <u>jury to decide</u> whether each of the Appellees was on notice of Boykin's serious medical needs when he repeatedly told them he could not breathe and whether Appellant Weaver saw him non-responsive and unconscious in the backseat of her patrol car. ROA 3193-3196.

The District Court erred by accepting the Magistrate's Report and granting summary judgment by finding that "Viewed in the light most favorable to Plaintiffs, the Court agrees with the report that there is no fact dispute sufficient to show Defendants had knowledge of a known serious medical condition or that the symptoms that Defendants were aware of were so obvious that Defendants should have concluded Boykin was at substantial risk of serious harm." ROA 4117. The District Court further erred by finding that "The report correctly finds that, even assuming Weaver could see Boykin as alleged by Madison, the symptoms Weaver was aware of were not so obvious to conclude she had actual knowledge of Boykin's distress." ROA 4119. The District Court erred when it concluded that, "The evidence before the Court viewed in the light most favorable to the Plaintiffs–simply does not create a fact issue sufficient to show that Defendants had knowledge of a known serious medical condition or that the symptoms that they were aware of were so obvious that they should have concluded otherwise." ROA 4120-21. Further, the District Court erred by finding that, "Defendants did not have actual knowledge that

Boykin was in serious medical distress based on the symptoms and circumstances that Defendants were aware of." ROA 4123.

**Whether Inability to Breathe is a Serious Medical Condition**

Here, material fact issues exist as to whether the inability to breathe or the loss of consciousness are serious medical conditions sufficient to trigger Appellee's duty to provide medical care. The Magistrate in this case stated, "I'm going to take judicial notice that difficulty breathing can be a serious medical condition, and I'm going take judicial notice that I think we all agree "can" means it depends on the situation at hand." (emphasis added) ROA 4243. Appellant posits to this Court that anytime someone is unable to breathe there is a serious medical condition requiring immediate medical aid; however, assuming arguendo, that there are times when the inability to breathe may not be a serious medical issue – whether "the situation at hand" dictates that the inability to breathe is in fact a serious medical condition is a material factual issue for a jury to decide.

Dr. Francis O'Connor stated in his report, "While it is not expected that a non-medical professional would recognize an ECAST event, Mr. Boykin displayed clear signs of distress that in my opinion warranted evaluation from a medical professional." ROA 2975-76. Dr. O'Connor testified that difficulty breathing or the inability to breathe is a serious medical condition "Because if you can't breathe, you can't get oxygen to your brain or your heart, you're going to die." ROA 3046.

Similarly, expert witness Kevin Madison wrote in his report that "There were sufficient red flags waiving that should have alerted Weaver and would have alerted a reasonably objective police officer on-scene that Boykin, who had run full-bore over half a mile in 90+ degree heat, who was handcuffed with his hands behind his back making it harder to expand and contract his chest and lungs, and who was complaining of an inability to breathe normally, needed immediate medical attention from EMS." ROA 2865.

It is clear – even to a child – that the inability to breathe is a serious medical issue, and at a minimum, the evidence in the record creates a genuine fact issue with that regard.

**Whether Appellees were aware Boykin was in Serious Medical Distress**

Here, material fact issues exist as to whether Appellees were aware Boykin was in serious medical distress which require reversal of the District Court's order granting summary judgment. *Ford v. Anderson Cnty., Texas*, 102 F.4th 292, 314-15 (5th Cir. 2024) ("While Plaintiffs have failed to provide a direct admission from Jailer-Defendants Strong and Jones that they heard Newsome's cries for help, we agree with Plaintiffs that they have raised legitimate 'fact issues as to each jailer's knowledge of [Newsome's] emergency condition in the ... hours prior to her death.' Because of these disputed fact issues, we REVERSE the district court's grant of summary judgment for Jailer-Defendants Jonathan Strong and Robin Jones.").

**Appellees were aware Boykin was Complaining that He Could Not Breathe**

It is undisputed that at the scene of the arrest, Hobbs was aware Boykin was complaining he could not breathe. ROA at 3193 at 6:29-6:34; 3193 at 6:39-6:40; 3619 at 6:19-6:58; 3269-3270; 3273; 3276; 3291.

It is undisputed that at the scene of the arrest, Scott was informed Boykin was complaining he could not breathe. ROA at 2788; 3193 at 9:12-9:15; 2789-91; 3196 at 1:01-1:10.

It is undisputed that at the scene of the arrest, Weaver was aware Boykin could not sit up, could not walk, and was complaining he could not breathe. ROA 3193 at 2:35-9:50; 3194 at 4:50-9:50.

It is also undisputed that during the transport, Weaver was aware Boykin was complaining he could not breathe, that he was going to pass out, and that he was pleading for help. ROA 3194 at 11:43-11:48; 12:18-12:24; 12:26-12:30; 12:39; 12:52; 12:55-12:56; 13:12-13:21.

Thus, Hobbs, Scott, and Weaver were all aware that Boykin was complaining that he could not breathe and was pleading for help and were thus aware of Boykin's serious medical condition.

**Weaver was Aware that Boykin became Non-Responsive**

It is genuinely disputed as to whether Appellee Weaver was aware that Boykin became non-responsive in the backseat of her car after complaining that he could not

breathe and was going to pass out. The video evidence shows Weaver <u>turn around</u> <u>and look</u> at Boykin <u>ten times</u> after he passed out. ROA 3194 at 15:11-15:12; 15:31-15:32; 15:40-15:41; 16:15-16:16; 16:18-16:19; 16:27-16:36; 16:46-16:48; 16:50-16:58; 17:02; 17:20. The video evidence shows Weaver <u>use her rear view mirror</u> to look at Boykin <u>six times</u> after he passed out. ROA 3194 at 15:14-15:15; 15:23-15:24; 15:29-15:30; 15:39; 16:13; 16:22. While Weaver claims she did not see Boykin was unconscious, a reasonable jury could find that she is not credible based off the video evidence clearly showing her l<u>ook at Boykin at total of sixteen times after he passed</u> <u>out</u>. ROA 3194 at 15:11-15:12; 15:31-15:32; 15:40-15:41; 16:15-16:16; 16:18-16:19; 16:27-16:36; 16:46-16:48; 16:50-16:58; 17:02; 17:20; 15:14-15:15; 15:23-15:24; 15:29-15:30; 15:39; 16:13; 16:22. Additionally, Boykin stopped responding to Weaver's questions – after stating he was going to pass out. ROA 3194 at 13:21-19:10.

Accordingly, there is a genuinely disputed material fact as to whether Weaver was aware, not only that Boykin could not breathe, but also that Boykin became non-responsive in her care – as she was passing the hospital! ROA 3137-3138.

**<u>Weaver Mocked Boykin Instead of Helping Him</u>**

This Court has explained that when officers mock a person in distress, their comments and behavior can be used to show deliberate indifference. *Kelson v. Clark*, 1 F.4th 411, 419 (5th Cir. 2021). In *Kelson*, this Court explained,

Moreover, instead of treating or even evaluating the visible head injuries, Clark and Cox allegedly mocked Fletcher and then, in an apparent attempt to cover their tracks, allegedly lied in their official report about interacting with Fletcher at all. Taken together, this is enough to allege that the officials "refused to treat him," "ignored his complaints," and engaged in conduct that "clearly evince[d] a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756 (internal quotation marks and citation omitted).

...

Clark and Cox further attempt to minimize these allegations, contending that "inappropriate comments and/or laughing are legally irrelevant" to deliberate indifference claims. Not so. *Kelson v. Clark*, 1 F.4th 411, 420 (5th Cir. 2021). The plaintiffs in Kelson alleged that Clark, Cox, and the surrounding officers harassed and laughed at Fletcher until he was transported to the detention facility, all without any medical treatment. Kelson v. Clark, 1 F.4th 411, 420 (5th Cir. 2021). This Court found that such conduct supports that the paramedics may have been both subjectively aware of, and disregarded, Fletcher's serious risk of injury.

(emphasis added) *Id*. at 419-20.

In this case, Weaver mocked Boykin, laughed at him, and actually started humming a tune instead of providing help for Boykin. In response to Boykin not being able to stand up on his own, Weaver stated, "It's either you're standing up or you're dragging. All right. Cool. Let's drag him."  ROA 3193 at 3:54-3:58. In response to Boykin pleading for help because he couldn't breathe, Weaver told Boykin, "You can't call I can't breathe after you ran forever and then you have felonies," and Boykin responded, "I can't." ROA 3193 at 6:43-6:51. Weaver heard Boykin plead for help by saying, "please help me," and Weaver responded, "I'm

going to help you get your way down to the jail." ROA at 3113-15; ROA 3193 at 7:56-8:03.

A couple of minutes into the drive, Boykin's head fell forward and hit the divider in Weaver's police car, Weaver heard the impact, and looked back to see Boykin's head against the plexiglass. ROA 3194 at 11:43-11:48. Boykin then said "Ma'am" – and Weaver responded, "Yeah?" ROA 3194 at 12:17-12:19. Boykin then told her, "I'm about to pass out." ROA 3194 at 12:18-12:19. Weaver responded, "You're gonna do what?" ROA 3194 at 12:20-12:21. Boykin again stated, "I'm about to pass out." ROA 3194 at 12:21-12:22. Weaver responded, "You're about to?" and Boykin said, "Yes." ROA 3194 at 12:23-12:24. Then, much more desperately, Boykin pleaded, "I'm about to pass out!" ROA 3194 at 12:26-12:27. Weaver responded, "You'll be ok, just lean against the glass." ROA 3194 at 12:28-12:30.

After Boykin became non-responsive, Weaver looked up into her rearview mirror at Boykin and could see he was slumped to the side, with his eyes closed, and gasping for air. ROA 3194 at 15:14-15:15. Weaver stated out loud, "alright." ROA 3194 at 15:17. Weaver then stated, "You know you're still going to jail either way right." ROA 3194 at 15:20-15:22. Weaver was literally driving past the Wadley Hospital at this time; however, Weaver did not take Boykin to the hospital. ROA 3137-3138.

At one point during the drive, Weaver said, "okay" apparently in response to seeing Boykin slumped to the side, with his eyes closed, and gasping for air. ROA 3194 at 15:33. Weaver then again turned around and looked at Boykin and could see he was slumped to the side, with his eyes closed, and gasping for air. ROA 3194 at 15:40-15:41. Weaver then <u>laughed to herself</u> after looking at Mr. Boykin and seeing he was slumped to the side, with his eyes closed, and gasping for air. ROA 3194 at 15:42; 3145 (Weaver testifying it wasn't a laugh but a "slight chuckle."). Weaver then asked, "are you comfortable?" with no response from Boykin. ROA 3194 at 15:53. Weaver then started <u>humming</u>, showing a complete and total disregard for Boykin's health and safety. ROA 3194 at 16:02-16:03; 3145. Less than a minute later, Weaver looked back at Darren and said, "you know somebody that passes out isn't able to stop themselves from falling forward right? Fun fact." ROA 3194 at 16:50-16:58. Darren was unconscious as she made this statement. *Id.*

Just as the "inappropriate comments" and "laughing" were legally relevant to showing the deliberate indifference claim in *Kelson*, so too should Weaver's inappropriate comments, laughing, and humming support that Weaver was both subjectively aware of, and disregarded, Boykin's serious risk of injury. *Kelson*, 1 F.4th at 419-20.

**<u>Appellees Failed to Abate the Harm</u>**

To show deliberate indifference, the plaintiff must show that the officials "refused to treat him, <u>ignored his complaints</u>, intentionally treated him incorrectly, or <u>engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs</u>." *Domino*, 239 F.3d at 756; *Kelson*, 1 F.45h a 417. It is undisputed that Appellees had the ability to obtain medical care for Boykin. ROA at 2793-95; 2798-99. Clearly, Appellees ignored Boykin's complaints and cries for help and engaged in conduct that evinced a wanton disregard for Boykin's serous medical needs. Appellees did nothing to abate the harm, instead repeatedly ignoring him, making inappropriate comments toward him, and even laughing at him.

Thus, Boykin has shown there are genuinely disputed material facts regarding whether Appellees were deliberately indifferent to his serious medical needs. Accordingly, the district court erred and this Court should reverse the district court's ruling accepting the magistrate's report and recommendation, and remand this case for trial.

**Appellant's Second Issue**

The district court erred in granting summary judgment because the law was clearly established that Appellees violated Boykin's Fourteenth Amendment rights when Appellees were aware that Boykin was complaining of an inability to breathe and begging for help, yet Appellees failed to take reasonable measures to abate his harm – instead ignoring his complaints. This was error.

When a defendant moves for summary judgment on the basis of qualified immunity, the district court must decide: (1) whether the facts, taken in the light most favorable to the plaintiff, show the officer's conduct violated a constitutional right; and, (2) whether that right was "clearly established" at the time of the defendant's alleged misconduct so that a reasonable official in the Appellee's situation would have understood that his conduct violated that right. *See Tolan*, 572 U.S. at 655-56.

To determine whether a right was clearly established, this Court must be able to point to controlling authority that defines the contours of the right in question with a high degree of particularity, a robust consensus of persuasive authority, or an obvious case under *Hope v. Pelzer*. *Shumpert v. City of Tupelo*, 905 F.3d 310, 319 (5th Cir. 2018), *as revised* (Sept. 25, 2018); *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). As this Court has explained, "in a qualified immunity inquiry "we needn't limit our analysis to the cases cited by Plaintiffs." *Ford*, 90 F.4th at 754; *See Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319,

338 (5th Cir. 2020); *Elder v. Holloway*, 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994) ("A court engaging in review of a qualified immunity judgment should ... use its 'full knowledge of its own [and other relevant] precedents.' " (quoting *Davis v. Scherer*, 468 U.S. 183, 192 n.9, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984))).

To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. *City of Tupelo*, 905 F.3d at 319. Ultimately, the touchstone is " 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.' " *Id.* There can be "notable factual distinctions between the precedents relied on . . . so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Austin v. City of Pasadena, Tex.*, 74 F.4th 312, 326 (5th Cir. 2023) (citing *Hope*, 536 U.S. at 740) (cleaned up).

The district court erred by finding that, "The Magistrate Judge properly determined Plaintiffs' failure to provide medical aid argument fails as a matter of law." ROA 4122. The district court erred in finding that it was not clearly established that Appellees should have summoned emergency medical assistance to address Boykin's repeated cries for help because he could not breathe. ROA 4121-22. The

district court erred by finding that, "As discussed above, Plaintiffs fail to meet this burden for any of the alleged constitutional violations, including Defendants' failure to provide unspecified aid, Defendants' failure to call an ambulance at the scene of the arrest, and Weaver's failure to drive Boykin to Wadley Hospital. Regardless of the correct level of specificity in framing the constitutional violation, the Magistrate Judge correctly concluded Plaintiffs have not met the "heavy burden" of showing that Defendants violated 'clearly established' law." ROA 4124.

## The Law was Clearly Established

The law was clearly established – putting Appellees on fair notice – that ignoring Boykin's complaints and refusing to provide him medical care when he was pleading for help due to an inability to breathe and then when he lost consciousness in the backseat of Weaver's patrol car would violate Boykin's constitutional rights. *Easter v. Powell*, 467 F.3d 459 (5th Cir. 2006); *Nerren v. Livingston Police Department*, 86 F.3d 469 (5th Cir. 1996); *Williams v. City of Yazoo, Mississippi*, 41 F.4th 416,423 (5th Cir. 2022); *Allen v. Hays,* 65 F.4th 736, 747-48 (5th Cir. 2023); *Fielder v. Bosshard*, 590 F.2d 105, 108 (5th Cir. 1979); *Rodrigue v. Grayson*, 557 F. App'x 341, 347 (5th Cir. 2014); *Hope v. Pelzer*, 536 U.S. 730, 740-41 (2002).

## *Easter v. Powell*, 467 F.3d 459 (5th Cir. 2006)

In *Easter*, a case decided in 2006 (well before Boykin's death), the Fifth Circuit explained that a prisoner can show his clearly established rights under the

Eighth Amendment were violated if a prison official "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Easter*, 467 F.3d at 464. In *Easter* the Fifth Circuit wrote "[a]ccording to Easter's allegations, Powell refused to provide any treatment to, and ignored the complaints of, a patient suffering from severe chest pain that she knew had a history of cardiac problems. Powell's alleged conduct meets the 'deliberate indifference' threshold." *Id*.

*Easter* clearly establishes the law for this case. Viewing the facts in the light most favorable to the non-movant, Appellees were told over and over that Boykin could not breathe, needed help, and was going to pass out, yet Appellees did nothing for him as he pleaded for help. ROA 3193 at 6:29-6:34; 3193 at 6:39-6:40; 3619 at 6:19-6:58; 3269-3270; 3273; 3276; 3291; 2788; 3193 at 9:12-9:15; 2789-91; 3196 at 1:01-1:10; 3193 at 2:35-9:50; 3194 at 4:50-9:50; 3194 at 11:43-11:48; 12:18-12:24; 12:26-12:30; 12:39; 12:52; 12:55-12:56; 13:12-13:21. This indifference continued when Boykin was ultimately passed out in the back of Weaver's patrol car and she was aware he was unconscious but did nothing. ROA 3194 at 15:11-15:12; 15:31-15:32; 15:40-15:41; 16:15-16:16; 16:18-16:19; 16:27-16:36; 16:46-16:48; 16:50-16:58; 17:02; 17:20; 15:14-15:15; 15:23-15:24; 15:29-15:30; 15:39; 16:13; 16:22. Appellees could have called an ambulance, provided medical aid

themselves, or even stopped at the hospital. Yet Appellees decided to ignore Boykin

and do <u>nothing</u>. These facts fit comfortably within those from *Easter*.

### *Nerren v. Livingston Police Department*, 86 F.3d 469 (5th Cir. 1996) and *Williams v. City of Yazoo, Mississippi*, 41 F.4th 416,423 (5th Cir. 2022)

Plaintiff also relies on *Nerren* from 1996. There, this Court explained the facts

and wrote:

> In the instant case, Nerren has alleged that his face and chest were marred with abrasions, he was in pain, and he informed the Arresting Officers that he needed medical attention. Moreover, the police had subjective knowledge that Nerren had recently been involved in a multiple vehicle injury accident. Nevertheless, after allegedly acknowledging Nerren's request of and need for medical attention, the Arresting Officers denied his request for the express reason that he had fled the scene of the accident without regard for the plight of the other victims. Accepting Nerren's allegations as true, the Arresting Officers had subjective knowledge of Nerren's need of medical attention yet turned a deaf ear to his request. If the evidence at trial supports these allegations, a reasonable juror could conclude that the Arresting Officers were deliberately indifferent to Nerren's constitutional right to medical attention.

*Nerren*, 86 F.3d at 473.

This Court then concluded the law was clearly established. *See Williams*, 41

F.4th at 423 (discussing *Nerren*). In *Williams*, the Fifth Circuit explained *Nerren*

rendered the law "clearly established," because "[t]here, we denied qualified

immunity to officers who rejected Nerren's request for medical assistance despite

knowing that he was involved in a car accident. The reasons for our decision are

44

familiar. Again, we noted the officers' knowledge of a potentially harmful circumstance and their 'deaf ear' to the detainee's request for care." *Id.*

The same analysis applies here. Viewing the facts in the light most favorable to the non-movant, Appellees were told over and over that Boykin could not breathe, needed help, and was going to pass out, yet Appellees did nothing for him as he pleaded for help. ROA at 3193 at 6:29-6:34; 3193 at 6:39-6:40; 3619 at 6:19-6:58; 3269-3270; 3273; 3276; 3291; 2788; 3193 at 9:12-9:15; 2789-91; 3196 at 1:01-1:10; 3193 at 2:35-9:50; 3194 at 4:50-9:50; 3194 at 11:43-11:48; 12:18-12:24; 12:26-12:30; 12:39; 12:52; 12:55-12:56; 13:12-13:21. This indifference continued when Boykin was ultimately passed out in the back of Weaver's patrol car and she was aware he was unconscious but did nothing. ROA 3194 at 15:11-15:12; 15:31-15:32; 15:40-15:41; 16:15-16:16; 16:18-16:19; 16:27-16:36; 16:46-16:48; 16:50-16:58; 17:02; 17:20; 15:14-15:15; 15:23-15:24; 15:29-15:30; 15:39; 16:13; 16:22. Appellees could have called an ambulance, provided medical aid themselves, or even stopped at the hospital. Yet Appellees decided to ignore Boykin. These facts fit comfortably within those from *Nerren* and *Williams*.

### *Allen v. Hays*, 65 F.4th 736, 747-48 (5th Cir. 2023) and

While *Allen v. Hays* was decided in 2023, in *Allen*, this Court found that it was <u>clearly established in November 2015</u> that officers who, despite being aware of pretrial detainee's dire condition, did nothing to secure medical help at all violated

detainee's Fourteenth Amendment right to medical care, for purposes of evaluating police officer's entitlement to qualified immunity in § 1983 action. *Allen v. Hays,* 65 F.4th 736, 748 (5th Cir. 2023). In *Allen*, this Court referenced *Dyer v. Houston* for the proposition that "existing precedent showed that officers who, 'despite being aware of the detainee's dire condition[,] ... did nothing to secure medical help' at all were on 'fair warning' that their behavior was deliberately indifferent." *Id.*; quoting *Dyer v. Houston*, 964 F.3d 374, 384-85 (5th Cir. 2020). While *Dyer* was decided in 2020, it was deciding the clearly established law in 2013. *Dyer*, 964 F.3d at 377. *Dyer* relied on *Thompson v. Morgan*, a case decided by this Court in 2001, standing for the premise that an officer is deliberately indifferent when they are aware of a detainee's dire condition and do nothing to secure medical help. *Thompson v. Upshor County, Texas*, 245 F.3d 447 (5th Cir. 2001).

The same analysis applies here. Viewing the facts in the light most favorable to the non-movant, Appellees were told over and over that Boykin could not breathe, needed help, and was going to pass out, yet Appellees did nothing for him as he pleaded for help. ROA at 3193 at 6:29-6:34; 3193 at 6:39-6:40; 3619 at 6:19-6:58; 3269-3270; 3273; 3276; 3291; 2788; 3193 at 9:12-9:15; 2789-91; 3196 at 1:01-1:10; 3193 at 2:35-9:50; 3194 at 4:50-9:50; 3194 at 11:43-11:48; 12:18-12:24; 12:26-12:30; 12:39; 12:52; 12:55-12:56; 13:12-13:21. This indifference continued when Boykin was ultimately passed out in the back of Weaver's patrol car and she was

aware he was unconscious but did nothing. ROA 3194 at 15:11-15:12; 15:31-15:32; 15:40-15:41; 16:15-16:16; 16:18-16:19; 16:27-16:36; 16:46-16:48; 16:50-16:58; 17:02; 17:20; 15:14-15:15; 15:23-15:24; 15:29-15:30; 15:39; 16:13; 16:22. Appellees could have called an ambulance, provided medical aid themselves, or even stopped at the hospital. Yet Appellees decided to ignore Boykin. These facts fit comfortably within those from *Allen, Dyer,* and *Thompson*.

### *Fielder v. Bosshard*, 590 F.2d 105, 108 (5th Cir. 1979)

In 1979, this Court decided *Fielder v. Bosshard*, a case where a request by a prisoner's mother to the jailer that he receive medical attention for delirium tremens was followed by a request from the prisoner himself. Fielder v. Bosshard, 590 F.2d 105, 108 (5th Cir. 1979). These requests were ignored, the jailers stating that they thought the prisoner was "faking." *Id*. This evidence was sufficient to support the jury's verdict for the plaintiff. *Id*. In *Fielder*, this Court explained,

> The jury was carefully and correctly charged that mere negligence was insufficient to sustain a finding for the plaintiffs. The jury obviously believed that the appellants had crossed the line between misfeasance and conscious cruelty. <u>In a case such as this, where the attitudes and states of mind of the defendants weigh so heavily, we are quite reluctant to read between the lines of the record. We commit our trust to the jurors who saw and heard the witnesses.</u>

(emphasis added) *Fielder*, 590 F.2d at 108–09.

Just as in *Fielder*, here, the Appellees were aware Boykin was in medical distress because he was complaining he could not breathe, complaining he was going

to pass out, and then fell unconscious. ROA at 3193 at 6:29-6:34; 3193 at 6:39-6:40; 3619 at 6:19-6:58; 3269-3270; 3273; 3276; 3291; 2788; 3193 at 9:12-9:15; 2789-91; 3196 at 1:01-1:10; 3193 at 2:35-9:50; 3194 at 4:50-9:50; 3194 at 11:43-11:48; 12:18-12:24; 12:26-12:30; 12:39; 12:52; 12:55-12:56; 13:12-13:21; 3194 at 15:11-15:12; 15:31-15:32; 15:40-15:41; 16:15-16:16; 16:18-16:19; 16:27-16:36; 16:46-16:48; 16:50-16:58; 17:02; 17:20; 15:14-15:15; 15:23-15:24; 15:29-15:30; 15:39; 16:13; 16:22. Just as in *Fielder*, the Appellees claim they thought Boykin was faking. ROA 3159-3160, 3272, 3619 at 6:19-6:58; 3193 at 6:39-6:40; 3193 at 6:43-6:51. Here, this Court should hold just as it did in Fielder, that "where the attitudes and states of mind of the defendants weigh so heavily, we are quite reluctant to read between the lines of the record." *Fielder*, 590 F.2d at 108-09. Just as in *Fielder*, this is a case where the jury should decide whether the Appellees "crossed the line between misfeasance and conscious cruelty." *Id*. at 108.

### *Rodrigue v. Grayson*, 557 F. App'x 341, 347 (5th Cir. 2014)

In *Rodrigue v. Grayson*, the defendant ignored the plaintiff's complaints of abdominal pain and vomiting. *Rodrigue v. Grayson*, 557 F. App'x 341, 347 (5th Cir. 2014). The plaintiff had a ruptured appendix causing these symptoms; however, the defendant did not know of the ruptured appendix – only the symptoms. *Id*. at 342. This Court explained,

> Officials can be on notice that their conduct violates a constitutional
> right even in "novel factual circumstances." *See Hope*, 536 U.S. at 741,

48

122 S.Ct. 2508. Here, Grayson and Fife knew of a prisoner's serious medical needs yet ignored his requests for treatment. The district court's factual findings—that appellants had subjective knowledge of Rodrigue's dire condition—remove this case from the realm of negligence or gross negligence, and render inapposite cases dealing with honest but inadequate medical care. Any reasonable person in appellants' position would have known that ignoring Rodrigue's complaints in light of his medical situation would be a violation of his rights under the Eighth Amendment. *See Gobert*, 463 F.3d at 346 (deliberate indifference when state actors 'refused to treat [prisoner], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs'").

*Id*. at 347.

Here, like in *Rodrigue*, the Appellees had subjective knowledge of Boykin's dire condition – his inability to breathe and he had fallen unconscious. ROA at 3193 at 6:29-6:34; 3193 at 6:39-6:40; 3619 at 6:19-6:58; 3269-3270; 3273; 3276; 3291; 2788; 3193 at 9:12-9:15; 2789-91; 3196 at 1:01-1:10; 3193 at 2:35-9:50; 3194 at 4:50-9:50; 3194 at 11:43-11:48; 12:18-12:24; 12:26-12:30; 12:39; 12:52; 12:55-12:56; 13:12-13:21; 3194 at 15:11-15:12; 15:31-15:32; 15:40-15:41; 16:15-16:16; 16:18-16:19; 16:27-16:36; 16:46-16:48; 16:50-16:58; 17:02; 17:20; 15:14-15:15; 15:23-15:24; 15:29-15:30; 15:39; 16:13; 16:22. Like in *Rodrigue*, it is of no consequence that Appellees were unaware of the underlying reason for the inability to breathe or loss of consciousness. *Rodrigue*, 557 F. App'x at 347. As Dr. O'Connor stated in his report, "While it is not expected that a non-medical professional would

recognize an ECAST event, Mr. Boykin displayed clear signs of distress that in my opinion warranted evaluation from a medical professional." ROA 2975-76. Accordingly, like in *Rodrigue*, this Court should find that Appellees were deliberately indifferent because Boykin's rights were clearly established. *Id.*

### *Hope v. Pelzer*, 536 U.S. 730, 740-41 (2002)

The law is also clearly established because the constitutional violation was obvious under *Hope v. Pelzer*. *Hope*, 536 U.S. at 740–41 (2002). *Hope* stands for the proposition that a violation can be so blatant or egregious that officers need no on-point precedent to know their conduct is illegal because of the "obvious cruelty inherent" in their actions. *Id*. at 745.

In *Hope*, prison guards forced plaintiff Hope to stand with his arms over his shoulders and handcuffed to a hitching post, shirtless, in the sun for seven hours, while giving him water only once or twice and denying him access to the restroom. *Id*. at 734–35. The guards taunted Hope about his thirst by giving water to dogs and spilling water from a cooler on the ground in front of him. *Id*. at 735. Finding that the actions were punitive and served no penological purpose, the Supreme Court concluded the guards had violated Hope's Eighth Amendment rights. *Id*. at 737–38.

Whether the question that must be clearly established is: "[F]ailing to call for emergency assistance in response to a serious threat to an inmate's life constitutes deliberate indifference" or if the question is whether "refusing to treat a detainee and

ignoring a detainee's complaints are unreasonable responses to a known medical risk" the answer should be equally obvious. There can be no legitimate argument that the law permitted Appellees to deny medical care to an arrestee, detainee, inmate, or prisoner who has a complete inability to provide his or her own medical care and who is complaining of an inability to breathe, begging for help, and then loses consciousness. ROA at 3193 at 6:29-6:34; 3193 at 6:39-6:40; 3619 at 6:19-6:58; 3269-3270; 3273; 3276; 3291; 2788; 3193 at 9:12-9:15; 2789-91; 3196 at 1:01-1:10; 3193 at 2:35-9:50; 3194 at 4:50-9:50; 3194 at 11:43-11:48; 12:18-12:24; 12:26-12:30; 12:39; 12:52; 12:55-12:56; 13:12-13:21; 3194 at 15:11-15:12; 15:31-15:32; 15:40-15:41; 16:15-16:16; 16:18-16:19; 16:27-16:36; 16:46-16:48; 16:50-16:58; 17:02; 17:20; 15:14-15:15; 15:23-15:24; 15:29-15:30; 15:39; 16:13; 16:22.

As in *Hope*, there is no purpose in denying medical care to an arrestee, detainee, inmate, or prisoner who has been detained securely and complains he cannot breathe or that he is struggling to breathe. Further, the need to provide some form of medical care to an arrestee, detainee, inmate, or prisoner who claims they cannot breathe should be indisputable. As Dr. O'Connor testified in this case, difficulty breathing or the inability to breathe is a serious medical condition "Because if you can't breathe, you can't get oxygen to your brain or your heart, you're going to die." ROA 3046. Undersigned counsel's five-year-old son appreciates the fact that if someone can't breathe then they need help. When Boykin

51

was begging for help because he couldn't breathe, the Appellees appreciated that too. Therefore, the manifest need for care when someone cannot breathe is so obvious that it must be clearly established under *Hope*.

**District Court's reliance on *Batiste v. Theriot*, 458 F. App'x. 351 (5th Cir. 2012)**

The District Court relied on *Batiste v. Theriot, 458 F. App'x. 351 (5th Cir. 2012),* for the idea that, "The [Magistrate] report correctly found that the Fifth Circuit has held that officers who are not medical professionals are entitled to qualified immunity when they attribute the source of labored breathing to a foot chase. *Id*. at 68-69 (citing *Batiste*, 458 F. Appx. at 357-58)." This is an inaccurate reading of this Court's opinion in *Batiste*.

In *Batise*, this Court explained, "The Plaintiffs' case for deliberate indifference to medical attention fails because they concede that the officers at the scene never thought that there was a serious medical emergency. Their brief states: "[T]he deputies failed to recognize that Othello was in the midst of a medical emergency." (emphasis added) *Batiste*, 458 F. App'x at 356. This Court in *Batiste* explained, "The failure to realize there was a medical emergency, and the concession of such by the Plaintiffs, negates any claim of deliberate indifference unless the risk of serious harm was so patently obvious that it should negate the knowledge requirement. (emphasis added) *Id*. Further, this Court explained, "The officers' actions were reasonable given the circumstances and they should have been granted

qualified immunity. <u>The records show that they called for an ambulance to be dispatched a mere two minutes after the tasing.</u>" (emphasis added) *Id.*

However, in this case, <u>Appellees never called an ambulance</u> (let alone two minutes after apprehension like in *Batiste*) and <u>nothing was done in response to Boykin's repeated cries for help</u> that he could not breathe or even after Weaver saw that he lost consciousness in the backseat of her patrol car. ROA 3193 at 6:29-6:34; 3193 at 6:39-6:40; 3619 at 6:19-6:58; 3269-3270; 3273; 3276; 3291; 2788; 3193 at 9:12-9:15; 2789-91; 3196 at 1:01-1:10; 3193 at 2:35-9:50; 3194 at 4:50-9:50; 3194 at 11:43-11:48; 12:18-12:24; 12:26-12:30; 12:39; 12:52; 12:55-12:56; 13:12-13:21; 3194 at 15:11-15:12; 15:31-15:32; 15:40-15:41; 16:15-16:16; 16:18-16:19; 16:27-16:36; 16:46-16:48; 16:50-16:58; 17:02; 17:20; 15:14-15:15; 15:23-15:24; 15:29-15:30; 15:39; 16:13; 16:22. In *Batiste*, it was <u>stipulated that the defendant officers did not realize there was a medical emergency</u>. *Batiste*, 458 F. App'x at 356. However, in this case, that is literally the genuine factual dispute that a jury could reasonably decide in favor of Appellant, and if so, could find Appellees were deliberately indifferent. *Ford*, 102 F.4th at 314; *Easter*, 467 F.3d 459; *Nerren*, 86 F.3d 469; *Williams*, 41 F.4th at 423; *Allen,* 65 F.4th at 747-48; *Fielder*, 590 F.2d at 108–09; *Rodrigue*, 557 F. App'x at 347; *Hope*, 536 U.S. a 740-41.

Accordingly, the law was clearly established, and the district court erred in finding that it was not. Thus, this Court should reverse the district court's order

granting qualified immunity and remand the case to the trial court so that the genuinely disputed material facts can be decided by a jury.

CONCLUSION AND PRAYER

Appellant asks this Court to find the district court erred in granting summary judgment, to find there are material fact disputes regarding whether Appellees violated Boykin's constitutional rights, to find that Appellees are not entitled to qualified immunity because the law was clearly established, to vacate the district court's judgment, and remand this case for trial.

**PALMER PERLSTEIN**

*/s/ James P. Roberts*
JAMES P. ROBERTS
State Bar No. 24105721

15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 972.204.5452
james@palmerperlstein.com

Attorney for Appellant.

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2024, that an exact copy of Plaintiff-Appellant's Brief was served via ECF to counsel for the Defendants-Appellees. I further certify that: (1) all privacy redactions have been made pursuant to 5th Cir. Rule 25.2.13; and (2) the electronic submission is an exact copy of the paper documents pursuant to 5th Cir. Rule 25.2.1.

*/s/ James P. Roberts*
**JAMES P. ROBERTS**
**PALMER PERLSTEIN**

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation in Rule 32(a)(7)(B) because:

- This brief contains 12,088 without any exclusions under Rule 32(f) accounted for;

This brief also complies with the typeface requirements of Rule 32(a)(5) and the type requirements of Rule 32(a)(6) because:

- This brief has been prepared in Times New Roman font, a proportionally-spaced typeface, using Microsoft Word 2010 with 14-point font for the text and 12-point font for the footnotes.

*/s/ James P. Roberts*
**JAMES P. ROBERTS**
**PALMER PERLSTEIN**